IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POLAR EXPRESS SCHOOL BUS, INC., | ) | |
| an Illinois Corporation, and | ) | |
| LAKEVIEW BUS LINES, INC., | ) | |
| an Illinois Corporation, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | Jury Trial Demanded |
| NAVISTAR, INC., a Delaware Corporation, | ) | |
| NAVISTAR INTERNATIONAL CORP., | ) | |
| a Delaware Corporation, and IC BUS, LLC | ) | |
| an Arkansas Limited Liability Company, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Polar Express School Bus, Inc. ("Polar") and Lakeview Bus Lines, Inc.

("Lakeview") by their attorney, Bruce Rose, as and for their *Complaint* against Defendants

Navistar, Inc. ("Navistar"), Navistar International Corp. ("Navistar International") and IC Corp.

("IC"), states as follows:

## COUNT I– RICO CLAIM (18 U.S.C. §1962(b))

### A. Introduction and Overview

1.  This lawsuit alleges violations of the federal Racketeer and Corrupt Organizations Act

("RICO"), 18 U.S.C. §1962(b), *et seq*., and Illinois's common law as applicable both to plaintiff

Polar Express School Bus, Inc.'s ("Polar") purchase of school buses manufactured, marketed and

sold by defendants Navistar, Inc. ("Navistar") and defendant IC Bus, LLC ("IC ") – both of

which are wholly-owned subsidiaries of defendant Navistar International Corp. ("Navistar

International") – and to plaintiff Lakeview Bus Lines, Inc.'s ("Lakeview") leasing of those buses from Polar.

2.   For at least eight years, from 2004 to 2008, Navistar knowingly, intentionally and fraudulently installed defendants' MaxxForce 7-liter diesel engines, and Navistar's equally-defective, predecessor diesel engine, the VT365 – which employed a slightly earlier version of the same defective emissions control- and other systems as the Navistar/IC MaxxForce 7-liter diesel engines (the "Defective Engines) – in, *inter alia*, defendants' 71-, 30-, 5+24-, and 3+12-seat school buses (including defendants' wheelchair-equipped buses used for special needs students).

3.   During the same time period, defendants also knowingly, intentionally and fraudulently installed an ABS braking system manufactured by a third-party supplier ("the Defective Brake System") in the same buses in which defendants' also installed their Defective Engines, including those buses sold to Polar and subsequently leased to Lakeview.

4.   Navistar and/or its sister company, IC, knowingly, intentionally and fraudulently sold their buses with defendants' Defective Engines and Defective Brake Systems into interstate commerce exclusively through their own, authorized dealers.

5.   Between 2007 and 2009, Polar purchased from one of defendants' authorized dealers, Midwest Transit, Kankakee, Illinois, a total of 40 Navistar/IC buses of various sizes and seat configurations, including wheelchair-equipped buses for special needs children, and all of these buses were, and are equipped with defendants' Defective Engines and Defective Brake Systems.

6.   After Polar purchased the buses with their Defective Engines and Defective Brake Systems, Polar unwittingly leased those same buses to Lakeview which, ever since, has borne the cost of either having those vehicles repaired at Navistar-authorized repair and service facilities,

2

or of paying a $10,000 annual fee to Navistar simply to have access to a list of part numbers so that Lakeview could order the proper part through one of Navistar's authorized repair and service facilities to be able to do certain repairs itself because the buses were out of warranty.

**The Genesis of Defendants' Defective Engines**

7.   As described more fully below, since in or around 2000, in a disastrous attempt to meet final diesel emission standards announced on, or about January 18, 2001 by the United States Environmental Protection Agency ("USEPA") (which were to go into effect in 2010, and since 2010, actually *did* go into effect in 2010), Navistar/IC's Defective Engines have employed – and those still on the road such as Polar's and Lakeview's vehicles *continue* to employ – Navistar's diesel engine emission Exhaust Gas Recirculation ("EGR") system.

8.   The EGR system is a botched technology which not only failed to meet the USEPA's 2010 emission standards, but in the process of Navistar's/IC's unsuccessful efforts to meet those standards, those defendants also destroyed the performance, operational and service capabilities of their diesel engines and related systems which have so consistently experienced control failures and other malfunctions that Navistar's/IC's EGR diesel engines are now the subject of multiple, class-action lawsuits filed around the country by owners and operators of tractor-trailer trucks (but not school buses) using Navistar's larger, but otherwise identical, MaxxForce 13-liter diesel engines.

9.   These class-action cases have been consolidated in the United States District Court for the Northern District of Illinois as MDL 2590, *In re: Navistar MaxxForce Engines*.

10. Moreover, on March 31, 2016 the United States Securities and Exchange Commission ("SEC") filed a securities fraud complaint in the United States District Court for the Northern District of Illinois against former Navistar president and CEO Daniel C. Ustian ("Ustian"),

docketed as No. 16 C 3885 ("*SEC Complaint*") who was behind Navistar's, Navistar International's, and IC's adoption and use of the EGR technology.

11. The *SEC Complaint* alleges, *inter alia*, that from late 2010 through 2012, Ustian and Navistar deliberately deceived investors – and of course, by implication, Navistar/IC customers such as Polar and Lakeview who continued to purchase Navistar/IC new and used vehicles – about the success of Navistar's efforts to meet the USEPA's 2010 emissions standards originally announced on or about January 18, 2001.

12. The SEC alleges that it was:

> … well known to Ustian and Navistar, [that] Navistar's engineers were having difficulty developing and certifying an EGR-only engine that could meet the [US EPA's 2010] 0.20 NOx standard without sacrificing fuel economy and other performance features, discussions with the EPA were at an impasse, and Navistar's applications [for approval of proposed Navistar EGR-only engines] were going nowhere.

> Nonetheless, from 2010 through 2012, instead of coming clean with the public regarding the difficulties Navistar was experiencing in developing and certifying a competitive EGR-only engine, Ustian engaged in a coverup. During this period, Ustian and Navistar made false and misleading public statements that led investors [and customers] to believe that Navistar's efforts to produce a commercially competitive EGR-only engine meeting the 0.20 NOx standard were proceeding without major engineering or EPA roadblocks.

*SEC Complaint*, ¶¶ 11-12.

## B. Parties

13. Plaintiff Polar Express School Bus, Inc. ("Polar") is an Illinois corporation with its offices in Palos Heights, Illinois.

14. Polar purchases new and used school buses, then leases them to plaintiff Lakeview Bus Lines, Inc.

15. Plaintiff Lakeview Bus Lines, Inc. ("Lakeview") is an Illinois corporation with its offices and operations located at 2400 Maywood Dr., Bellwood, Cook County, Illinois.

4

16. Lakeview has been in the business of providing bussing services to schools and school districts, as well as for private charter, throughout northern Cook County, Chicago and Chicago's near-West suburbs for more than 30 years.

17. Lakeview's still-growing bus fleet includes 71-, 30-, 5+24-, and 3+12-seat school buses (including special, wheelchair equipped buses), 40 of which were manufactured by Navistar which installed its Defective Engines and Defective Brake Systems in them.

18. As set forth above, defendant Navistar, Inc. ("Navistar") is a subsidiary of the Navistar International Corporation (formerly known as International Harvester Corporation or "Navistar International"), and it, like its parent Navistar International, is a Delaware corporation, authorized to do business in Illinois, and headquartered in Lisle, Illinois

19. Navistar International's subsidiaries and affiliates, including defendant Navistar, produce commercial and military trucks, buses, diesel engines, RVs, and chassis, as well as providing parts and services for its vehicles.

20. Navistar manufactured, produced and marketed its 7-liter MaxxForce diesel-powered school buses throughout the country, both directly and through its sister company and co-defendant, IC.

21. IC is an Arkansas limited liability company authorized to do business in the State of Illinois.

## C. Jurisdiction and Venue

22. This Court has jurisdiction over this matter pursuant to 18 U.S.C. §1964(c).

23. This Court has jurisdiction over Lakeview's state law claims pursuant to 28 U.S.C. §1367 in that they form part of the same case or controversy as Lakeview's claims under 18 U.S.C. §1962.

5

24. Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) in that defendants all reside in this judicial district, and a substantial part of the events or omissions giving rise to Lakeview's claims occurred in this judicial district

25. This Court has personal jurisdiction over all of the defendants in that, at all relevant times hereto, they have resided, and/or have transacted business in this judicial district.

### D. The RICO Enterprise

26. Navistar, with its parent company Navistar International, and its affiliate, IC, heads and controls an association-in-fact RICO enterprise comprising a second tier of Navistar-authorized dealers of new and used Navistar/IC vehicles, including buses, as well as a third tier of Navistar-authorized repair and service facilities.

27. Navistar/IC vehicles, including buses, can only be purchased from Navistar-authorized dealers, and generally, they can only be serviced at Navistar-authorized repair and service facilities.

28. If the vehicle is out of warranty, there are a limited number of repairs that an owner or lessee can perform itself, but in order to do so, the owner or lessor must pay a $10,000 annual fee to Navistar simply to have access to a parts list so that the correct part can be ordered from Navistar through a Navistar-authorized repair and service facility.

29. That structure allowed Navistar, Navistar International and IC to control all information concerning their development, marketing, sales and servicing of their Defective Engines and Defective Brake Systems, while ensuring that all revenue from those activities remains within the RICO enterprise and contributes to the continuation and operation of the RICO enterprise.

30. As set forth below in greater detail, Navistar – through Ustian and others – repeatedly and publicly falsely touted the advances that Navistar was making with the development of their

EGR technology in their Defective Engines thereby misleading both the investing public and the purchasers of the Navistar/IC vehicles, including buses.

31. Although, for example, it was widely known within Navistar, its authorized dealers and authorized service and repair facilities, *i.e.*, the RICO enterprise, from in or around early 2001 through 2012 that the EGR technology was a failure in terms of both emissions control, *and* because of the EGR technology's adverse impact on the performance and reliability of the Navistar/IC vehicles in which the Defective Engines were installed, neither the Navistar-authorized dealers, nor the Navistar-authorized service and repair facilities disclosed any of the defects to purchasers of the Navistar/IC vehicles including buses.

32. Instead, taking advantage of Navistar's continuing, deliberate and fraudulent public misrepresentations as to the purported quality of the Defective Engines, and the deliberate concealment of the defects in the Defective Brake Systems, Navistar's authorized dealers continued selling the Navistar/IC vehicles, reaping the monetary benefit of the resulting sales proceeds in return for their not disclosing the vehicles' known defects and/or not revealing Navistar's, Navistar International's and IC's fraud on the investing and vehicle-purchasing public.

33. Similarly, the Navistar-authorized service and repair facilities continued collecting the revenue from the excessive repairs needed just to keep the Navistar/IC vehicles, including buses, functioning and on the road; the excessive repairs resulting from the inherent defects in the Defective Engines and Defective Brake Systems.

34. Meanwhile, the Navistar-authorized service and repair facilities concealed the defendants' fraud by continually and consistently falsely blaming the need for the vehicles' excessive repairs on the vehicles' owners and/or operators, instead of exposing Navistar's,

Navistar International's and IC's fraud on the investing and vehicle-purchasing public.

35. Indeed, the Navistar-authorized service and repair facility to which Lakeview took two of its leased buses in October 2014 for repairs to the EGR technology still falsely told Lakeview's representatives that Lakeview was the only school bus company having problems with the Defective Engines, and that the problems were due to the way that Lakeview was operating the buses, rather than that the engines themselves were defective at the time they were both installed in the buses and left Navistar/IC's factory.

## E. The Defendants' Pattern of Racketeering Activity

### 1. The EPA Emissions Regulatory Regime

36. The defendants' primary impetus for their wrongful acts was the Clean Air Act Extension of 1970 ("the Clean-Air Act"), 42 USCA §§ 7521–7551.

37. The Clean-Air Act provides the framework for the regulation of emissions from motor vehicles and engines operated in the United States.

38. In compliance with the requirements of the Act, on January 18, 2001 (giving manufacturers significant lead time) the "EPA issued its Final Rule-Control of Air Pollution from New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements (Final Rule), effective March 1, 2001.[1]

39. The Final Rule in part states:

> We are establishing a comprehensive national control program that will regulate the heavy-duty vehicle and its fuel as a single system. As a part of this program, new emissions standards will begin to take effect in model year 2007, and will apply to heavy-duty highway engines and vehicles. These standards are based upon the use of high-efficiency catalytic exhaust emission control devices or comparably effective advanced

---

[1] The 2007 EPA Emission Standard for 2007 and after Heavy-Duty Diesel Engines is at 40 C.F.R. § 86.007-11.

> technologies. Because these devices are damaged by sulfur, we are also reducing the level of sulfur in highway diesel fuel significantly by mid- 2006.

66 Fed. Reg. 5002 (Jan. 18, 2001).

40. The EPA standard heavy-duty, on-highway, diesel emission standard (referred to herein as the "2007 EPA Emission Standard") was promulgated in 2001 so as to "provide engine manufacturers with the lead time needed to effectively phase-in the exhaust emissions control technology that will be used to achieve the emission benefits of the new standard." *Id*.

41. The 2007 EPA Emission Standard regulated diesel vehicle/engine emission standards and diesel fuel standards simultaneously, as a single system:

> These options will ensure that there is widespread availability and supply of low sulfur diesel fuel from the very beginning of the program, and will provide engine manufacturers with the lead time needed to efficiently phase-in the exhaust emission control technology that will be used to achieve the emissions benefits of the new standards.

*Id*.

42. Following the EPA's issuance of its January 18, 2001 Final Rule, Navistar and its competitors focused on developing and perfecting engine technologies to meet the strict EPA emission standards that would ultimately apply to all 2010 model year trucks and engines.

43. Even prior to the EPA's January 18, 2001 announcement, however, by in or around 2000, two different engine technologies already had been created in an effort to limit the carbon and other emissions of diesel engines, and these two technologies subsequently competed to satisfy the 2010 diesel emission standards of the EPA after the EPA announced them on January 18, 2001.

44. The EGR (Exhaust Gas Recirculation) process was adopted and adapted by Navistar,

9

which aggressively championed its superiority in reducing emissions by displacing oxygen to reduce exhaust pollutants while within the engine (*i.e.*, "in-cylinder").

45. The standard widespread and competing technology, however, was called "Selective Catalytic Reduction ("SCR"), a process that reduced emissions by treating the engine exhaust with a urea-based solution injected into the exhaust-stream and combined with the exhaust after leaving the engine cylinders.

46. Each one of Navistar's meaningful competitors (*i.e.*, Mack, Volvo, Daimler, PACCAR, *etc.*) proceeded to perfect the SCR system and timely receive their EPA certification.

47. Navistar, however, disregarded the prevailing engineering consensus and represented that it would develop an EGR reliant engine that also would be EPA-certified on a timely basis.

48. Navistar subsequently spent hundreds of millions of dollars to develop and market its "Advanced EGR" engines, including the VT-365 and 7-MaxxForce engines which Navistar and IC began installing in buses in 2004.

49. These engines were still in the developmental stage, and while they showed some initial improvement in emissions control, the reliability and performance issues inherent in the EGR system also began to manifest themselves.

50. Finally, after approximately $700 million in expenditures, Navistar still was unable to commence filing an application for certification of its Defective Engines with the EPA even 10 months *after* the applicable EPA standards had become effective and over six (6) years from when the new and final EPA requirements were released to the industry on January 18, 2001.

51. Thus, it soon became clear to Navistar's top management and to Navistar's other key personnel that its decision to proceed with EGR, and to differentiate its diesel emission control technology from SCR was a failure that would result in significant warranty and performance

10

exposure, but those material facts were willfully and intentionally concealed from the public –

including purchasers like Polar, and lessees like Lakeview – by Navistar, Navistar International,

IC and Navistar's authorized dealers and service and repair facilities.

52. Instead, in order to continue selling its vehicles and generating cash flow, Navistar began

selling non-conforming engines by exhausting EPA credits it had previously accrued on earlier

versions of its engines, and, when those credits were exhausted, Navistar paid a non-compliance

fine to the EPA for each diesel engine sold that did not meet the new standard.

53. Thus, defendants knew for years that they were facing technological and developmental

problems that were extremely serious, but those problems were never revealed to purchasers

and/or lessees of Navistar/IC buses such as Polar and Lakeview which continued purchasing the

Navistar/IC buses from Navistar-authorized dealers with their Defective Engines and Defective

Brake Systems, and continued servicing them at, or through Navistar-authorized service and

repair facilities based on Navistar's fraudulent public statements, and Navistar's concealment of

the true, material facts by the Navistar-authorized dealers and service and repair facilities.

**2. The Predicate Acts in Violation of 18 U.S.C.A. §§1341 and 1343**

54. Defendants, further concealed their engines' deficiencies and furthered their own

collective fraud in order to continue their improper sales process by issuing numerous press

releases and holding conference calls with investors and the public over the interstate wires –

both activities violating 18 U.S.C.A. § 1343 ("the wire fraud statute") – typically every time

Navistar International filed a quarterly or annual report with the Securities and Exchange

Commission.

55. Navistar and Navistar International also issued other communications over the interstate

wires in violation of the wire fraud statute, as well as through the United States mails in violation

of 18 U.S.C.A. § 1341 ("the mail fraud statute"), that were relied on by both investors, and vehicle purchasers and/or lessees throughout the marketplace, including Polar and Lakeview.

56. Those false and fraudulent statements touted EGR's superiority, and further stated that the EGR process would revolutionize, and was revolutionizing Navistar's compliance with the EPA's 2010 emission standards through defendants' EGR technology which, Navistar claimed, was able to accomplish, and had, accomplished the necessary exhaust compliance requirements.

57. For example, in conjunction with its publicly-filed, December 11, 2006 Form 8-K Report – which was filed using, and intentionally made publicly available over the interstate wires through EDGAR – Navistar International falsely indicated that it was continuing to improve its Defective Engines, stating, "[w]e expect to achieve fuel economy, durability/reliability and performance neutrality compared to our 2006 engine. Our plan is to offset the decreased energy content of ultra low (sic) sulfur diesel fuel and the small fuel usage for active regeneration with improvements in the basic engine combustion system and electronic controls." Exhibit A hereto.

58. The December 11, 2006 Form 8-K Report also contained material that was subsequently used in Navistar International's December 15, 2006 investor (and public) conference call conducted over the interstate wires.

59. These materials asserted that Navistar's "engine plans to achieve 2009 goals" included the "recovery of emissions", "MaxxForce Big Bore" (referring to Navistar's efforts to develop large diesel engines for the trucking industry using the EGR technology), and most misleadingly, having a "competitive advantage in 2010 emissions technology". Exhibit A hereto.

60. These public statements (conveyed over the interstate wires in violation of the wire fraud statute to the investing and to the vehicle-purchasing and vehicle-leasing public) not only failed to reveal the limitations with Navistar's EGR system, and the resulting deterioration in reliability

and performance that Navistar and its engineers had *already* encountered with the Defective Engines with the EGR system, but these statements gave the misleading impression to the public, including Polar and Lakeview, that Navistar was successfully moving forward on actually *expanding* its use of its EGR technology.

61. Three months later, in Navistar International's March 1, 2007 Form 8-K – again filed, and intentionally made publicly available through EDGAR over the interstate wires – Navistar featured its "great products: engine", featuring its 2006 VT-365 and that engine's 2007 replacement the MaxxForce 7, hyping them as a "value proposition" for the engines' purported "reliability", "performance", and "fuel economy". Exhibit B hereto.

62. Once again, this filing revealed nothing of the actual problems with reliability and performance that Navistar was actually experiencing trying to develop its EGR systems that were being used in defendants' engines.

63. Three weeks later, Navistar International filed a Form 8-K, which again included exhibits to be used in its March 20, 2007 investor (and public) conference call which summarized Navistar's supposed "keys to success". Exhibit C hereto.

64. These purported "keys to success" included Navistar/IC's 2007 MaxxForce 5 through 10 engine launches (which in part, replaced the earlier VT-365 version of Navistar/IC's Defective Engine), plus the production of the MaxxForce 11-liter and 13-liter truck engines which were to begin production in late 2007, while Navistar further claimed that it would "continue to focus and invest in *quality*" (emphasis added).

65. Again, these statements failed to reveal, and instead, deliberately concealed Navistar/IC's continuing failure both to perfect their EGR systems, and to correct the ever-increasing reliability and performance issues that worsened with every marginal improvement to the EGR systems.

13

66. Over the next year, Navistar International continued filing, and intentionally making publicly available through EDGAR over the interstate wires, its quarterly Form 8-K and annual reports.

67. On March 6, 2008, Navistar International filed, and intentionally made publicly available its then-current Form 8-K, doing so through EDGAR over the interstate wires. Exhibit D hereto.

68. The March 6, 2008 Form 8-K stated, *inter alia*, "[s]ince 2004, our focus on reliability and quality has produced a significantly improved 2007 emissions-compliant engine, currently in the market…" Exhibit D hereto.

69. That statement was false for the reasons explained above and it failed to disclose Navistar's problems with its Defective Engines.

70. Approximately 2 months later, Navistar International filed its May 27, 2008 Form 8-K Report in which it presented Navistar's "strategy to sustain an improved 2010 and beyond", explaining "why we chose EGR vs SCR. Exhibit E hereto.

71. According to the May 27, 2008 Form 8-K (filed, and intentionally made publicly available through EDGAR over the interstate wires), "we believe SCR is a traditional-stopgap approach; SCR forces the burden of compliance on the customer; EGR builds on technologies we are using today without ongoing customer cost, complexity, and inconvenience; [and] minimal, if any, effect on fuel economy". Exhibit E hereto.

72. Based on its own experiences over the preceding seven years, Navistar International – and certainly Navistar/IC – knew that its purported "belief" about SCR being a "stopgap approach" had no basis in fact, and was meant simply to disparage what Navistar International, and Navistar/IC knew was the actually successful technology.

73. Navistar International and Navistar/IC also knew that the statements that their EGR

technology lacked "ongoing customer cost, complexity, and inconvenience" and that the technology had "minimal, if any, effect on fuel economy" were false.

74. Nevertheless, in the February 9, 2009 issue of *Transport Topics*, Exhibit F hereto, Navistar continued peddling the false notion that EGR was superior to SCR. Exhibit F hereto.

75. *Transport Topics* is a major trucking industry publication available digitally over the interstate wires, and in print through the United States mails.

76. After explaining the difference between the SCR and EGR systems, the *Transport Topics* article noted that Navistar was "the only manufacturer to offer what it calls 'enhanced' exhaust gas recirculation, an update of technology that trucks have used since 2002 to meet Environmental Protection Agency mandates."

77. The article quotes Timothy Shick, Navistar's director of marketing for the engine group as stating, " 'Navistar has been building EGR engines since 2004 and we have been *perfecting* the technology all the time…' "("Emphasis added").

78. *Transport Topics* also quotes Ustian who criticized the SCR system stating, " '[t]he other thing that EGR avoids is the risks of an SCR strategy… Read the label on this and it will show you that there are challenges with keeping control of using this [SCR] technology: "Store between 23 degrees and 68 degrees." So essentially it says you can't throw it outside… You can't operate it in conditions above 85 [degrees] or below 12 [degrees]. You can, but… it will put the burden on to the customers' "

79. Both Shick's and Ustian's were false at the time they were made: Navistar was not "perfecting" its EGR technology "all the time" but, instead, was facing mounting problems with the technology in terms of emissions, performance and reliability.

80. Moreover, Ustian mischaracterized the nature and limitations of the SCR system which

15

was, in fact, superior to Navistar's EGR system.

81. This was hardly the only time that Ustian mischaracterized the EGR and SCR systems, or falsely compared them.

82. In late 2007, Ustian told investors, "[Navistar's] ability to achieve our goals without adding customer cost and inconvenience [through EGR] is a competitive advantage."

83. Ustian's statements, again , falsely indicated, not only that Navistar was succeeding in developing its EGR technology, but that Navistar had succeeded so well that it was actually surpassing the achievements of its competitors.

84. Between November 2010 and January 2011 alone, Ustian falsely stated:

- "We're 100% there in terms of our ability to do it [achieve 0.20g NOx] ...."

- [W]e'll be applying for our 0.2 certification here in the next couple of months.""

- Because of all the anxiety that is out there, we're going to certify that over the next few months here at 0.2 grams ....

- "Since we were the only ones out there, there is a lot coming at us with this can't work and, of course, now we are out in the marketplace and that's over. That argument is over. We are out there in the marketplace. We are exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over."

- "We will show you that product, by the way, in Melrose Park [Illinois] on the 25th. We will show you the modifications. It won't be a great drama to you because you won't be able to see anything other than - we would be able to show you the data that it meets 0.2 and show you how we are able to meet it." (Emphasis added.)

85. In fact, the EGR technology was never ready for regular commercial use and was not "out there in the marketplace" with a conforming diesel engine as Navistar represented.

16

86. The true facts, known by Navistar International, and by Navistar/IC, but concealed from the public, and from prospective and actual purchasers and lessees of Navistar's buses equipped with Navistar's Defective Engines, including Polar and Lakeview, were:

a)     Navistar's method for compliance with EPA guidelines had been a failure requiring that Navistar revise its plan to meet emission requirements through its engineering acumen, thus resulting in a patchwork, compromised engine prone to a need for excessive repairs and additional enhancement.

b)     Navistar did not timely have engines available to meet the 2010 EPA standards, as it previously had assured the vehicle-purchasing and leasing public such as Polar and Lakeview; rather Navistar was, in fact, left far "behind the curve", so that it and/or IC necessarily sold a diesel engine lacking a perfected capability and suitable design.

c)     Navistar's DT-365 and MaxxForce 7-liter diesel engines and related equipment for its buses were defective as sold by Navistar and/or IC, hastily and imperfectly manufactured.

d)     The engines and related systems would invariably subject bus owners and lessees such as Polar and Lakeview using defendants' buses with their Defective Engines to experiencing substantial "downtime," *i.e.*, periods of inoperability, coupled with extensive repair costs for systemic engine failure related to faulty fuel injectors, EGR valves, cooler and other EGR system components, including the engine's oil cooler, main computers ("HCU"), Sohn canisters, inspection drive modules ("IDRs") and a chronically flawed turbo charger "system."

e)     On information and belief, a large portion of Navistar's MaxxForce 7-liter diesel engines were manufactured in Mexico using inferior metal that melted and collapsed

internally causing, or contributing to these problems;

f)     Based on the above, Navistar/IC lacked a basis for selling their MaxxForce 7-liter diesel engine in Navistar's school bus line on the terms and conditions shared with unwary "customers."

87. Moreover, neither Navistar, nor IC every acknowledged that there was *any* defects at all in their brake systems despite the fact that their brake system's main ABS computer consistently and repeatedly goes bad, leaving each bus's parking brake "locked up" and unable to move without repairs, potentially stranding dozens of children, including special needs children, *e.g.*, in northern Illinois in January for hours at a time.

88. Defendants further concealed their fraud and the inherent problems with their Defective Engines and Defective Brake Systems by having their authorized service centers – the only places where defendants' buses could be serviced, or through which an owner and/or lessee could procure necessary parts for do-it-yourself repairs – repeatedly tell Lakeview that Lakeview was the only school bus operator having repeated problems with the Defective Engines and Defective Brake Systems and that Lakeview itself was causing all of the repeated breakdowns and problems.

89. For example, Lakeview was repeatedly told that the reason that the EGR cooler (which had a three-year warranty) failed so often in Lakeview's buses was that Lakeview was "idling the engines too fast"; a completely false statement, but one made repeatedly.

90. Defendants marketed and sold their buses equipped with their Defective Engines and Defective Brake Systems through material omissions and/or materially false and misleading statements to the consuming public, including Polar and Lakeview, concerning the purported reliability, durability and endurance of, *inter alia*, the EGR diesel emission control systems of

the Defective Engines that Navistar/IC sold in their school buses.

91. For example, as late as 2011 in another Navistar Engine Group brochure available, *inter alia*, through the Internet over the interstate wires, Exhibit G hereto at 2, Navistar was still claiming that " 'Always Performing' is our *promise* to our customers that they are buying the *best performing engine* with the commitment of Navistar Engine Group employees *and our dealers standing behind every product.* (Emphasis added).

92. The brochure further stated that Navistar was "developing clean diesel power solutions without sacrificing the reason diesel has been the power choice of industry for 100 years: power, economy, durability and reliability." Exhibit G hereto at 4.

93. "Always performing" was a false "promise"; Navistar had already "sacrificed" its vehicles' "power, economy, durability and reliability" in its vain efforts to perfect the failed EGR technology.

94. Defendants' marketing misrepresented and omitted material facts about Navistar's Defective Engines and Defective Brake Systems, including without limitation, that Navistar's EGR diesel engines failed to comply with mandatory regulations and standards required by the United States Environmental Protection Agency ("EPA") for 2010 (and newer) vehicles in accordance with strict EPA emissions standards, but more importantly for Polar and Lakeview, those marketing materials failed to disclose that, in a vain effort to meet the mandatory EPA 2010 standards, defendants had continued relying upon, and tinkering with the defective engine design (that already had been abandoned by everyone else in the industry) with the primary result of a loss of "power, economy, durability and reliability" in Navistar/IC's vehicles, including the buses bought by Polar and lease by Lakeview.

95. As further proof of defendants' efforts to fraudulently conceal the defects in their engines

and brake systems to enable defendants to continue selling their buses with their Defective Engines and Defective Brake Systems to the unsuspecting public including Polar and Lakeview, unlike defendants' major competitor, Blue Bird Corporation ("Blue Bird") – which sends repeated notices of warranty and safety recalls to purchasers of its buses – neither Polar nor Lakeview *ever* received any recall notices from defendants.

96. The three defendants' knowingly and intentionally false and fraudulent statements, as set forth above, as well as all three defendants', and the RICO enterprise's knowing, intentional and deliberate concealment of the actual facts concerning defendants' Defective Engines and Defective Brake Systems perpetuated the vehicle-purchasing and leasing public's false perception that Navistar manufactured and sold products *only* of substantial quality, even though the actual facts, well-known to the defendants and to the RICO enterprise, were directly contrary to that public perception.

97. Navistar and Navistar International deliberately, intentionally and fraudulently concealed those actual facts--which, again, were well-known to the three defendants at the time that the public statements were made –from the investing and vehicle-purchasing public through Navistar's and Navistar International's public statements which were made in violation of the wire and mail fraud statutes as set forth above.

98. Navistar and Navistar International knowingly and intentionally made their false and fraudulent statements precisely to perpetuate the vehicle-purchasing public's false perception of the quality of the Navistar/IC buses specifically to deceive the vehicle-purchasing and vehicle leasing public, including Polar and Lakeview, into continuing to purchase and lease defendants' vehicles by fraudulently concealing the true facts.

99. Those facts were that, despite Navistar/IC's decade-long efforts to "perfect" their EGR

20

technology, they had, instead, merely created vehicles with engines that fell well below defendants' own descriptions of their vehicles in terms of those vehicles' emissions control, reliability, and performance including fuel consumption, and with severely flawed brake systems.

### 3. Plaintiffs' Victimization By, and Damages Proximately Resulting from Defendants' Wrongful Actions

100.     As stated above, Lakeview has repeatedly taken its leased Navistar/IC buses to Navistar-authorized repair and service facilities – the only locations where Navistar permits its buses to be serviced – for repairs to Lakeview's buses' Defective Engines and Defective Brake Systems, but the service facilities have failed to perform adequate, suitable or capable repairs and *none* have provided more than short-term remedies before Lakeview's buses had to be returned for further repairs because the problems needing repair lie within the design of the Defective Engines and Defective Brake Systems, themselves, and therefore are irreparable.

101.     Lakeview has also performed limited types of repairs to its Navistar/IC buses, but defendants control even these in-house repairs by requiring owners or operators of their school buses who or which perform repairs themselves to pay Navistar a $10,000 *annual* fee just to have access to Navistar/IC's parts lists for school buses.

102.     The parts list is necessary because parts for Navistar/IC school buses are not available anywhere except through Navistar-authorized service and repair facilities and must be ordered by the part's number.

103.     Even then, as Lakeview has endured multiple times since 2007, the necessary part is not available when ordered, and it frequently takes days or even weeks for the part to arrive for Lakeview to pick up, thereby resulting in down time because the bus cannot be used until repaired.

104.    The delay in parts availability is substantially worsened by the much greater frequency with which defendants' buses require repairs due to the defects in their Defective Engines and Defective Brake Systems, as compared to buses manufactured and sold by defendants' competitors.

105.    Despite having hundreds of opportunities to disclose the truth during Lakeview's trips to Navistar-authorized repair and service facilities either to have buses repaired, or to order and purchase replacement parts for the buses, neither the Navistar-authorized repair and service facilities that Lakeview used for repairs, and/or the purchase of replacement parts, nor the Navistar-authorized dealer from which Polar purchased the Navistar/IC buses that it leased to Lakeview, ever informed either Polar or Lakeview that the Defective Engines and Defective Brake Systems in defendants' buses could not, in fact, be "repaired" because the engines and brake systems were, themselves, inherently defective because of their designs.

106.    As set forth above, Navistar and Navistar International repeatedly, affirmatively misrepresented the facts concerning the quality and performance of their Defective Engines and Defective Brake Systems, and they also actively concealed the true, material facts concerning defendants' Defective Engines and Defective Brake Systems by refusing to reveal the true facts despite their repeated, contrary public statements.

107.    Defendants' concealment of the true, material facts concerning defendants' Defective Engines and Defective Brake Systems was intended to induce a false belief in the purchasing public, including Polar and Lakeview, that the Navistar/IC Defective Engines and Defective Brake Systems were, in fact, at least comparable to all other similar engines and brake systems in being free of any significant defects, and in fact, those statements were intended to induce the false belief in the investing, as well as the school bus purchasing and leasing public

22

that Navistar/IC's systems were actually state-of-the-art.

108.     The truth behind Navistar's and Navistar International's false and fraudulent statements could not have been discovered by the vehicle-purchasing and/or leasing public, including Polar and Lakeview, through a reasonable inquiry or inspection of the Navistar/IC Defective Engines and Defective Brake Systems because the defects were design flaws which defendants kept concealed, at least from Polar and Lakeview, and on information and belief based on defendants' treatment of Polar and Lakeview, from the rest of the school bus purchasing and leasing public through the repeated explanations by the Navistar-authorized servicer repair facilities that Lakeview was the only Navistar/IC bus operator experiencing problems with the Navistar/IC Defective Engines and Defective Brake Systems, and that the problems were due to the way that Lakeview operated the buses.

109.     Polar and Lakeview relied on defendants' silence as to the true facts concerning their Defective Engines and Defective Brake Systems as a representation that the true facts did not exist.

110.     If Polar and Lakeview had known the true facts, then they would not have purchased and/or leased Polar's fleet of Navistar/IC school buses.

111.     Defendants' active concealment of the true facts concerning their Defective Engines and Defective Brake Systems, as well as their other deceptive conduct, as set forth above, were all performed with the intention of deceiving the vehicle-purchasing and leasing public, including Polar and Lakeview, into continuing to purchase and/or lease the Navistar/IC buses and this active concealment created an opportunity and a duty for defendants to speak the truth, but defendants fraudulently, repeatedly refused to do so.

112.     As a direct and proximate result of Polar's and Lakeview's reliance on

23

defendants' and the RICO enterprise's fraudulent concealment of the true facts concerning defendants' Defective Engines and Defective Brake Systems, Polar purchased, and Lakeview leased 40 Navistar/IC buses in various seating configurations, but all of which have experienced the same problems:

a)   the failure and/or repeated failure of high-pressure oil pumps at a cost of $723 just for each pump, plus the cost of other necessary parts and labor for *each* replacement resulting in total damages to Lakeview of approximately $110,000;

b)   the failure and/or repeated failure of oil coolers at $335 for each replacement pump plus labor, for total repair costs and damages to Lakeview of approximately $74,800;

c)   the replacement of the main computer at a cost of $7000 each for total repair costs and damages to Lakeview of approximately $280,000;

d)   the yearly replacement of the Sohn canister at a cost of approximately $788-$888 per replacement for  total repair costs and damages to Lakeview of approximately $216,800;

e)   the repeated failure of the ABS computer causing the parking brake unexpectedly to lock up leaving the buses, and students stranded at unpredictable times, locations and in varying weather conditions at a replacement cost of approximately $3800 for each occurrence (often at least two times per year), for total replacement costs and damages to Lakeview of approximately $2,430,000;

f)   the repeated replacement of the Injection Drive Module every time a bus went out for repairs at a cost of $200 each for a total replacement cost and damages to Lakeview of approximately $96,000;

g)   excessive fuel costs to keep the buses idling on cold mornings necessitated by the

difficulty of starting the engines during cold weather even when the buses were stored in a garage for an estimated cost and damages to Lakeview of $134,400

113.     Additionally, when Lakeview's Navistar/IC leased buses required repair, frequently there were no parts available at the Navistar-authorized service and repair centers and/or the repairs themselves took anywhere from several days to a week or more resulting in average downtime for each bus of approximately 40 days per year while waiting for repairs and/or replacement parts.

114.     Depending on the size of the bus, when Lakeview's leased Navistar/IC buses were and are capable of operating, they generate, and are expected to generate $220 per day to $310 per day.

115.     As a direct and proximate result of the Navistar/IC buses' excessive downtime, Lakeview has lost approximately $2,965,000 in revenue.

116.     In addition to the Navistar/IC buses' excessive repair and operating costs, plus their resulting loss of revenue due to disproportionate downtime resulting from the Defective Engines and Defective Brake Systems, Navistar's buses also suffer from a shortened lifespan – roughly half that of other manufacturers' buses – and all of these conditions has resulted in a negligible resale and/or trade-in value when compared to other school buses such as those manufactured by Blue Bird.

117.     As a result of the diminished resale value, upon resale of its Navistar/IC buses, Polar will lose at least approximately $350,000.

118.     Based on the foregoing facts, defendants' fraudulent conduct was done willfully and wantonly.

WHEREFORE, Plaintiffs Polar Express School Bus, Inc and Lakeview Bus Lines, Inc.,

respectfully request the entry of judgment in their favor and against defendants Navistar, Inc., Navistar International Corp. and IC Corp. and the entry of an order awarding Polar and Lakeview:

    a.   compensatory damages in the base amounts of $350,000 and $6,307,000 respectively, with those amounts trebled to $1,050,000 and $18,921,000 respectively pursuant to 18 U.S.C. §1962(b) as plaintiffs' total compensatory damages; and

    b.   punitive damages in the amount of $50,000,000; and

    c.   plaintiffs' reasonable attorney's fees; and

    d.   plaintiffs' costs; and

    e.   such other and further relief as the Court deems just and equitable.

## COUNT II
## RICO CLAIM (18 U.S.C. §1962(c))

119.     Plaintiffs Polar and Lakeview repeat, reallege and incorporate by reference ¶¶ 1-118 of Count I set forth above as though fully set forth herein as ¶ 119 of Count II.

120.     As set forth above, defendants Navistar, Navistar International and IC conducted and/or participated directly and/or indirectly in the conducting of the RICO enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C.A. §§ 1341 and 1343.

121.     As a result, Navistar, Navistar International and IC have violated and continue to violate 18 U.S.C. §1962(c) as a direct and proximate result of which, Lakeview has suffered substantial damages as also set forth above.

WHEREFORE, Plaintiffs Polar Express School Bus, Inc and Lakeview Bus Lines, Inc., respectfully request the entry of judgment in their favor and against defendants Navistar, Inc., Navistar International Corp. and IC Corp. and the entry of an order awarding Polar and Lakeview:

    a.   compensatory damages in the base amounts of $350,000 and $6,307,000 respectively, with those amounts trebled to $1,050,000 and $18,921,000 respectively pursuant to 18 U.S.C. §1962(c) as plaintiffs' total compensatory damages; and

    b.   punitive damages in the amount of $50,000,000; and

    c.   plaintiffs' reasonable attorney's fees; and

    d.   plaintiffs' costs; and

    e.   such other and further relief as the Court deems just and equitable.

## COUNT III
## COMMON-LAW FRAUD

122.    Plaintiffs Polar and Lakeview repeat, reallege and incorporate by reference ¶¶ 1–118 of Count I set forth above as though fully set forth herein as ¶ 122 of Count III.

123.    As set forth above, defendants Navistar, Navistar International and IC engaged in a scheme to defraud, *inter alia*, the vehicle-purchasing and vehicle-leasing public, including Polar and Lakeview.

124.    In the course of carrying out their scheme to defraud, Navistar and Navistar International made multiple misrepresentations and/or actively concealed the material facts concerning details in their Defective Engines and Defective Brake Systems.

125.    Polar and Lakeview could not have discovered the truth through a reasonable inquiry or inspection of the Navistar/IC Defective Engines and Defective Brake Systems, and instead relied upon defendants' silence as to the true facts as a representation that the true facts did not exist.

126.    If Polar and/or Lakeview had known the true facts, then Polar would not have purchased its fleet of Navistar/IC school buses, and Lakeview would not have leased that fleet from Polar.

27

127. Defendants' active concealment of the true facts concerning their Defective Engines and Defective Brake Systems and their other deceptive conduct, as set forth above, were all performed with the intention of deceiving the vehicle-purchasing and vehicle-leasing public, including Polar and Lakeview, into continuing to purchase and lease the Navistar/IC buses which created an opportunity and a duty for defendants to speak the truth, but defendants fraudulently, repeatedly refused to do so.

128. As a direct and proximate result of Polar's and Lakeview's respective reliance on defendants' fraudulent concealment of the true facts concerning defendants' Defective Engines and Defective Brake Systems, Polar purchased 40 Navistar/IC buses in various seating configurations and Lakeview leased those buses from Polar, and all of those buses have experienced the same problems, which directly and proximately resulted in a total cost and damage to Lakeview for repairs and downtime of approximately $6,307,000 plus a lost resale value of approximately $350,000 for total proximately-caused damages to Polar of $350,000:

129. Based on the foregoing facts, defendants' fraudulent conduct was done willfully and wantonly.

WHEREFORE, Plaintiffs Polar Express School Bus, Inc and Lakeview Bus Lines, Inc., respectfully request the entry of judgment in their favor and against defendants Navistar, Inc., Navistar International Corp. and IC Corp. and the entry of an order awarding Polar and Lakeview:

     a. compensatory damages in the amounts of $350,000 and $6,307,000 respectively; and

     b. punitive damages in the amount of $ 50,000,000; and

     c. plaintiffs' costs; and

     d. such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Respectfully submitted,

/s/ Bruce Rose_____
One of Plaintiffs' Attorneys


Bruce Rose
The Law Office of Bruce Rose
10560 W. Cermak Road
Westchester, Illinois 60154
(708)562-9880
 bruce.rose@bruceroselaw.com
ATTY. NO. 3125523